# UNITED STATES DISTRICT COURT

# DISTRICT OF CONNECTICUT

| | |
|---|---|
| **PLH VINEYARD SKY LLC, ALLCO RENEWABLE ENERGY LIMITED and ALLCO FINANCE LIMITED INC.** | ) ) ) ) |
| | ) |
| **Plaintiffs** | ) |
| **v.** | ) ) |
| **CITY OF ANSONIA, CONNECTICUT, THE UNITED ILLUMINATING COMPANY, AVANGRID NETWORKS INC., AVANGRID INC., and the JOINT VENTURE of United Illuminating Company, Avangrid Networks, Inc., and Avangrid Inc., AND DOES 1-20** | ) ) ) ) ) ) ) ) ) |
| | ) |
| **Defendants.** | ) |

Case No. 3:23-cv-833

## COMPLAINT FOR CIVIL RIGHTS VIOLATIONS, UNLAWFUL TAKING, DECLARATORY AND INJUNCTIVE RELIEF, DAMAGES AND OTHER RELIEF

1.      PLH VINEYARD SKY LLC, ALLCO RENEWABLE ENERGY LIMITED and ALLCO FINANCE LIMITED INC. (the "Plaintiffs") as and for their complaint against the Defendants, the CITY OF ANSONIA, CONNECTICUT (the "City"), THE UNITED ILLUMINATING COMPANY ("UI"), AVANGRID NETWORKS INC. ("NETWORKS"), AVANGRID INC. ("AVANGRID"), and the JOINT VENTURE of United Illuminating Company, Avangrid Networks, Inc., and Avangrid Inc. ("AVANGRID JV") and DOES 1-20 (collectively, the "Defendants") make the following allegations in support thereof upon information and belief.

## INTRODUCTION

2.      Plaintiffs are developers and operators of solar energy facilities.

3.      PLH Vineyard Sky LLC ("PLH") is the owner of the real property commonly known as 31 Benz Street, Ansonia, CT (the "Property").

4.      Despite active opposition from the City, in June 2021 the Connecticut Siting Council ("CSC") granted a permit for the Plaintiffs to build two ground-mounted solar facilities on the Property (the "Ansonia Projects" or the "Benz Solar Projects"). A condition of the CSC's approval is that the stormwater runoff catch basin must tie into the City's stormwater sewer, a common requirement for development projects.  Tying into the City's stormwater drain should have been a routine event, as it is a ministerial, non-discretionary action, that is available to all land development projects and landowners in the City.

5.      The City has refused to allow the Plaintiffs to tie-into the stormwater sewer preventing the Ansonia Projects from being constructed, resulting in an unlawful taking of Plaintiffs' property and contracts related to the Ansonia Projects,[1] and violating Plaintiffs' civil rights.

6.      Two of the contracts related to the Ansonia projects are contracts with the UI Defendants.

## FACTS

### *The City's Unlawful Takings of Plaintiffs' Property.*

7.      On June 17, 2021, the CSC approved the permit for construction of the Ansonia Projects on the Property.  One of the conditions of the permit is that the Plaintiffs adhere to the Connecticut Department of Energy and Environmental Protection ("DEEP") approved registration for the Ansonia Projects under the General Permit Registration for the Discharge of Stormwater

---

[1] *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304 (1987) (temporary takings require compensation even if the regulatory prohibition is subsequently lifted).

and Dewatering Wastewaters from Construction Activities.  A required element of the General Permit registration is to obtain a signed letter from the City authorizing the connection of stormwater basin number 2 into the City's stormwater system.  Tying into the City's stormwater drain should have been a routine event, as it is a non-discretionary action that is available to all land development projects and landowners in the City.  It should also have been a routine event given the City's obligations under its own MS4 General Permit.  Since August 2021, Plaintiffs have made continuous efforts to deal with the City's unlawfully stonewalling the Ansonia Projects and the non-discretionary connection to the stormwater drain.  The City has ignored every communication from Plaintiffs regarding this issue.  DEEP also attempted to intervene with the City to no avail.  On December 3, 2021, Plaintiffs applied to the City's Department of Public Works ("DPW") and Michael D'Allessio as the superintendent of DPW to connect to the City's stormwater sewer system. Following the initial application to DPW, on December 6, 2021, Plaintiffs again filed another complete and proper application for a permit together with the necessary fees to connect to the City's stormwater sewer system.  Having received no response from DPW or Michael D'Allessio or the City as multiple inquiries, on August 23, 2022, a representative of the Plaintiffs met with Rita St. Jacques, Ansonia's Sewer Administrator, and John Tomesella, the Shift Operator on the Ansonia Water Pollution Control Authority, to discuss Plaintiffs' application.   Rita St. Jacques and John Tomesella confirmed to Plaintiffs that any application to tie into the City's stormwater system must be processed through DPW.  Plaintiffs were also informed that Michael D'Alessio was no longer the superintendent of DPW and that position was currently unfilled at the City.  Given that new information, on August 29, 2022, Plaintiffs (for the third time) resubmitted the application to DPW.  DPW's response was that only the City's counsel, John Marini, would be able to answer questions regarding the Plaintiffs'

application.   The City and Marini have continued to refuse to process Plaintiffs' request to tie-in to the stormwater system. The Plaintiffs' application met all requirements of the Connecticut State Building Code and complied with the City's zoning regulations.   Therefore, the issuance of the applied-for permit is a ministerial act.  The City has unlawfully stonewalled the Plaintiffs in order to block the Ansonia Projects.

8.      The City has also taken Plaintiffs' Property in an additional way.   The City has issued baseless retaliatory blight violations to PLH, imposed a lien on the Property in connection with the baseless blight violations (the "Blight Lien") while at the same time refusing to issue permits to PLH to replace a dilapidated garage on the site, a target of the blight violation.   PLH's inability to replace the dilapidated garage has resulted in PLH's inability to use that part of its land for any purpose.

### *The Contracts Between Plaintiffs And The UI Defendants*

9.      Plaintiffs have proposed various solar energy facilities in UI's electrical service territory in Connecticut.   The Plaintiffs' solar farms will generate two classes of goods.  The first class represents the electric energy, which UI is obligated to purchase under Federal and State law at a price equal to its long-term forecasted "avoided costs."   But UI has refused.

10.     The second class of goods represents the environmental certificates that are generated by, but are separately tradable from, the underlying energy.  Because the electricity will be generated from solar energy, the solar projects generate what are generically called "renewable energy credits", or "RECs."  The Plaintiffs have entered into various contracts with UI for the sale of those RECs.  UI, however, has breached its obligations under those contracts by, among other things, hindering Plaintiffs' ability to construct its solar farms by breaching its obligation to timely

provide Plaintiffs with interconnection agreements, and process Plaintiffs' applications to connect those projects to the electric grid.

11.    Plaintiff Allco Renewable Energy Limited ("AREL") is a party to three renewable energy certificate contracts with UI, Contract #ZL22230 is for a 999 kilowatt ("kW") solar project at 57 Park Lane, Woodbridge, CT, and Contracts #ZL22227 and #ZL22229 are each 999 kW solar projects at 31 Benz Street in Ansonia, CT.  Each contract is a 15-year contract under which UI is obligated to purchase renewable energy certificates at a fixed per megawatt-hour price.

12.    Interconnection applications for all three projects were received by UI on October 5, 2018.

13.    The Delivery Term Start Date ("DTSD") (which is the date the Plaintiffs are supposed to start delivering RECs) for the Ansonia Contracts and the Woodbridge Contract was July 1, 2020.   Pursuant to the terms of those Contracts, it is an event of default if AREL fails to satisfy any of the prerequisites for the purchase of renewable energy certificates within the date that is twelve (12) months of the DTSD (the automatic termination date), which was originally June 30, 2021.  AREL elected to extend the automatic termination date by providing additional performance deposits extending the termination date to June 30, 2023.  Those extensions, however, do not extend the contract term.  Thus, the 15-year term of the contract keeps getting shorter causing a loss to the Plaintiffs.

14.    The UI Defendants' breach of their obligation to timely provide Plaintiffs with interconnection agreements hinders and prevents the Plaintiffs from constructing the solar farms, which leads directly to the UI Defendants' unlawful hindrance and breach of the REC contracts.

15.    On April 14, 2023, Plaintiffs declared a force majeure under the Ansonia Contracts. UI disputes that a force majeure has occurred and on June 15, 2023, urged Plaintiffs to sue the City

promptly.

16.    UI has failed to timely and properly proceed on a just and reasonable basis with the interconnection process for Plaintiffs' projects to connect to the electric grid.

17.    Plaintiffs have provided a substantial security deposit under each REC contract (including the Ansonia Contracts and the Woodbridge Contract among others) to secure their performance.

18.    Plaintiffs have also invested substantial amounts in each project in reliance on the REC contracts and in reliance on the UI Defendants' obligation to proceed on a just and reasonable and timely basis with the interconnection process for Plaintiffs' projects to connect to the electric grid.  Plaintiffs have relied substantially by preparation and performance on the expectation that the Plaintiffs would be able to sell RECs under the various REC Contracts (including the Ansonia Contracts and the Woodbridge Contract among others).

19.    Because the UI Defendants have unlawfully refused to honor its contractual and tariff obligations, the projects have been delayed.  The actions of the UI Defendants have hindered and prevented Plaintiffs from meeting the time requirements of the REC Contracts causing financial loss to Plaintiffs.

20.    The UI Defendants have also hindered and prevented Plaintiffs' performance under the Contracts because of the UI Defendants' unreasonable and unjust practices and costs in the interconnection process for each of the projects that would deliver RECs under the REC Contracts (including the Ansonia Contracts and the Woodbridge Contract among others) causing financial loss to Plaintiffs.

**PARTIES**

21.    Plaintiff PLH Vineyard Sky LLC is a Florida limited liability company, whose

single member is Thomas Melone, a citizen of the State of Florida.  Plaintiff Allco Finance Limited

Inc. is a Florida corporation and a citizen of the State of Florida. Plaintiff Allco Renewable Energy

Limited is a Florida corporation and a citizen of the State of Florida.

22.    The Defendant, City of Ansonia, is a municipality located within the State of

Connecticut.

23.    Upon information and belief, the Defendant, The United Illuminating Company is

a corporation formed under the laws of the State of Connecticut and a subsidiary of Avangrid Inc.

Upon information and belief, UI is a citizen of Connecticut because of its state of incorporation,

and a citizen of Spain because its nerve center is in Spain.

24.    Upon information and belief, the Defendant, Avangrid Inc. is a corporation formed

under the laws of the State of New York, and controlled by Iberdrola S.A. ("Iberdrola"), a

corporation organized under the laws of the Kingdom of Spain.  According to its 2022 10-K,

Avangrid is the unified corporate presence for Iberdrola in the United States. Upon information

and belief, Avangrid's nerve center is in Spain.  Upon information and belief, Avangrid is a citizen

of the State of New York and the Kingdom of Spain. Plaintiffs are informed and believe, and on

that basis allege, that Avangrid is in some way responsible for the acts and omissions alleged in

this Complaint and proximately caused Plaintiffs' damages alleged herein. Plaintiffs are likewise

informed and believe, and on that basis allege, that Avangrid, in addition to acting for itself and

on its own behalf individually, are and were acting as the co-conspirator, agent, servant, employee

and representative of, and with the knowledge, consent and permission of, each and all other UI

Defendants, and within the course, scope, and authority of said conspiracy, agency, service,

employment and representation.

25.    Upon information and belief, the Defendant, Avangrid Networks Inc., is a

corporation formed under the laws of the State of Maine, a subsidiary of Avangrid Inc. and controlled by Iberdrola. Upon information and belief, Avangrid Networks Inc. is a citizen of the State of Maine and the Kingdom of Spain. Plaintiffs are informed and believe, and on that basis allege, that Networks is in some way responsible for the acts and omissions alleged in this Complaint and proximately caused Plaintiffs' damages alleged herein. Plaintiffs are likewise informed and believe, and on that basis allege, that Networks, in addition to acting for itself and on its own behalf individually, are and were acting as the co-conspirator, agent, servant, employee and representative of, and with the knowledge, consent and permission of, each and all other UI Defendants, and within the course, scope, and authority of said conspiracy, agency, service, employment and representation.

26.     Upon information and belief, the Avangrid JV is formed under the laws of the State of Connecticut as a joint venture to operate and exploit the utility business in Connecticut nominally owned by UI. Upon information and belief, the Avangrid JV is a citizen of the States of Maine, Connecticut and New York and the Kingdom of Spain. Plaintiffs are informed and believe, and on that basis allege, that the Avangrid JV is in some way responsible for the acts and omissions alleged in this Complaint and proximately caused Plaintiffs' damages alleged herein. Plaintiffs are likewise informed and believe, and on that basis allege, that the Avangrid JV, in addition to acting for itself and on its own behalf individually, are and were acting as the co-conspirator, agent, servant, employee and representative of, and with the knowledge, consent and permission of, each and all other UI Defendants, and within the course, scope, and authority of said conspiracy, agency, service, employment and representation.

27.     Plaintiffs are informed and believe, and on that basis allege, that each of the Defendants named as Does 1 through 20 are in some way responsible for the acts and omissions

alleged in this Complaint and proximately caused Plaintiffs' damages alleged herein. Plaintiffs are likewise informed and believe, and on that basis allege, that each of the Defendants, including those named fictitiously herein, in addition to acting for itself and on its own behalf individually, are and were acting as the co-conspirator, agent, servant, employee and representative of, and with the knowledge, consent and permission of, each and all other Defendants, and within the course, scope, and authority of said conspiracy, agency, service, employment and representation. The true names and capacities of Defendants Does 1 through 20, inclusive, are unknown to Plaintiffs. Plaintiffs therefore sue Does 1 through 20 under fictitious names and Plaintiffs will seek leave of the court to amend this complaint to allege such names and capacities as soon as they are ascertained.

## JURISDICTION AND VENUE

28.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 because the action brings claims arising under federal law.  This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. §1332 because this action is between citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs and pursuant to 15 U.S.C.§2310(d).

29.    This Court is empowered to grant declaratory relief by 28 U.S.C. §2201, 2202 and 42 U.S.C. §1983 and Rule 57 of the Federal Rules of Civil Procedure.

30.    This Court is empowered to grant preliminary and permanent injunctive relief by, *inter alia*, 28 U.S.C. §2202, and Rule 65 of the Federal Rules of Civil Procedure.

31.    This Court has personal jurisdiction over Defendants because each Defendant resides in Connecticut, and/or does business in Connecticut that is the subject of this suit, and a substantial part of the events giving rise to this action occurred in Connecticut.

32.    Venue is proper in this District under 28 U.S.C. §1391(b)(1) and (2) because a substantial part of the events giving rise to this action occurred in the District of Connecticut.

**CLAIMS FOR RELIEF**

**COUNT I**
**DUE PROCESS AND EQUAL PROTECTION (CLASS OF ONE)**
**(Violation of the Fifth and Fourteenth Amendments to the U.S. Constitution**
**and 42 U.S.C. § 1983)**
**(against the City and the City Does)**

33.    Plaintiffs restate and incorporate by reference each and every allegation in preceding paragraphs as if fully set forth herein.

34.    The Due Process Clause of the Fourteenth Amendment bars government action that does not substantially advance a legitimate state interest, and that is arbitrary and irrational. (U.S. Const. amend. XIV; *Lingle v. Chevron U.S.A. Inc.* 544 U.S. 528, 542 (2005).

35.    Plaintiffs have a protected property right or interest in their personal property, including their money, the solar projects, the power purchase agreements and other contracts related to the property, in their real property, and in their other property interests.

36.    Plaintiffs have been discriminated against as compared to other persons that seek to tie-in to the City's stormwater sewer. *See, Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam) (recognizing a constitutional claim as a "class of one" by showing that plaintiff had "been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.")

37.    Plaintiffs have been denied the right to tie-in to the City's stormwater sewer and targeted by the Defendants for retaliation for no legitimate regulatory reason. *Del Monte Dunes at Monterey, Ltd v. City of Monterey*, 920 F.2d 1496, 1508 (9th Cir. 1990) (recognizing constitutional

claim for denial of a permit "motivated, not by legitimate regulatory concerns, but by political pressure from neighbors and other residents.")

38.    The Defendants' actions retroactively and substantially damage Plaintiffs' property rights in order to confer a private benefit on a class of private interests, is arbitrary and capricious, and, therefore, violate the substantive due process rights of Plaintiffs.

39.    Defendants have violated Plaintiffs' rights to due process and equal protection.

40.    As a result, Plaintiffs are entitled to damages, and to declaratory and injunctive relief (i) restoring the Plaintiffs to the position they would have been in but for Defendants' unlawful conduct, which includes compelling the City to permit Plaintiffs to connect to the City's stormwater sewer, (ii) paying damages, (iii) enjoining the City from further interference with Plaintiffs' projects, and (iv) paying Plaintiffs' legal fees under 42 U.S.C. §1988.

## COUNT II
## FIFTH AMENDMENT TO THE U.S. CONSTITUTION – UNLAWFUL TAKING
### (Violation of the Fifth and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. § 1983)
### (against the City and the City Does)

41.    Plaintiffs repeat and re-allege the allegations contained in each of the preceding paragraphs as if fully set forth herein.

42.    Plaintiffs made substantial investments in the Benz Solar Projects based upon reasonable investment-backed expectations at the time the investments were made.

43.    Those investments were encouraged by the State of Connecticut and its policies.

44.    The Plaintiffs' investment-backed expectations were that (i) the City Defendants would respect the exclusive jurisdiction of the CSC over the Benz Solar Projects and (ii) the City Defendants would respect their obligations to process ancillary, ministerial permits under State law.

45.     The City Defendants' adverse actions against Plaintiffs unilaterally seek to remake State law concerning the development of solar facilities and abrogate Connecticut's policies of promoting small renewable energy generation, and upset settled, investment-backed expectations after private industry has already committed to its investments.

46.     The City Defendants' coordinated and concerted conspiracy to interfere with the construction of the Benz Solar Projects, including, without limitation, intentionally refusing to process any of the Plaintiffs' building applications (and its request to tie-in to the City's stormwater sewer) and placing a lien on the Property related to bogus blight claims, constitute a taking of Plaintiffs' real property without compensation in violation of the Takings Clause of the Fifth Amendment to the United States Constitution, made applicable to state and local governments by the Fourteenth Amendment. *Chicago, B. & Q.R. Co. v. Chicago*, 166 U.S. 226, 17 S. Ct. 581, 41 L. Ed. 979 (1897).

47.     The Takings Clause prohibits the government from taking private property unless (a) it is for a "public use" and (b) "just compensation" is paid to the owner. U.S. Const. amend. V & XIV; *see also Brown v. Legal Foundation of Wash*., 538 U.S. 216, 231-232 (2003) (making clear the Clause's two separate requirements)).

48.     If the government "fails to meet the 'public use' requirement," then "that is the end of the inquiry"—"[n]o amount of compensation can authorize such action." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528 (2005).  As the United States Supreme Court has explained: "it has long been accepted that the sovereign" (the government) "may not take the property of A for the sole purpose of transferring it to another private party B." *Kelo v. City of New London*, 545 U.S. 477 (2005).

49.     "Nor would the [government] be allowed to take property under the mere pretext

of a public purpose, when its actual purpose was to bestow a private benefit." *Id.* at 478.

50.    Here, there is no "public purpose" for the City's actions and is therefore unconstitutional.

51.    Unconstitutional takings commonly arise in the context of the government attempting to take land or other real-property interests. But that is not the extent of the Takings Clause's reach. When "the demand for money . . . operate[s] upon . . . an identified property interest by directing the owner of a particular piece of property to make a monetary payment," the Takings Clause applies. *Koontz v. St. Johns River Water Mngmt. Distr.,* 570 U.S. 595, 613 (2013).

52.    The Takings Clause protects against uncompensated takings of personal, as well as real, property. *Horne v. Dep't of Agriculture*, 135 S. Ct. 2419, 2425-26 (2015).

53.    Here the City Defendants' actions and inactions are not for a public use.

54.    Even if the City Defendants' actions effected a taking of private property for a public use or purpose (which they did not), they are still unconstitutional under the "unconstitutional conditions" doctrine, as applied in the context of the Takings Clause. Under that doctrine, the City Defendants may not condition nor deny a permit unless the City Defendants are able to demonstrate that the public's need bears an "essential nexus" and "rough proportionality" to actual, public impacts associated with exercise of the Plaintiffs' right or privilege; if the condition fails either standard, it effects an unconstitutional taking of private property.

55.    Even if the City Defendants' actions effected a taking of private property for a public use or purpose, they still are uncompensated and thus violates the Takings Clause.  The City Defendants have provided no compensation to Plaintiffs.  The Plaintiffs are unable to utilize the property for any reasonable and proper purpose because the City will not process any of the Conn. Gen. Stat. §29-263 applications or release the Blight Lien.  Such actions by the City equates to a

practical confiscation that has destroyed any economic utilization of Plaintiffs' land other than exploiting its natural state.  See *Bartlett v. Zoning Commission,* 161 Conn. 24, 282 A.2d 907 (1971); *Dooley v. Town Plan & Zoning Commission*, 151 Conn. 304, 197 A.2d 770 (1964).

56.    Even if the City's actions do not rise to the level of a *per se* taking or practical confiscation, the diminution of the Plaintiffs' property as a result thereof constitutes an unlawful taking without compensation in violation of Fifth Amendment to the United States Constitution and Article I., §11 of the Connecticut Constitution.

57.    Plaintiffs' reasonable investment-backed expectations were based on State law granting the CSC the exclusive jurisdiction over the development of the Benz Solar Projects, and that the Defendants would issue, as they do for any other landowner, ministerial permits.

58.    Plaintiffs also had a reasonable investment-backed expectation that the Defendants would not act in retaliation for the CSC granting a permit to Plaintiffs and would process the §29-263 applications and the application for a connection to the City's stormwater system.

59.    The City Defendants' regulatory actions and inactions have caused and will cause hundreds of thousands of dollars, if not millions of dollars in damage, a serious financial loss by any measure, and may render certain assets, such as the contracts with off-takers for energy and environmental attributes, worthless, and in all events less valuable.

60.    All City Defendants conspired to deprive, and participated in the deprivation of, Plaintiffs' rights and the unlawful taking through their affirmative actions and inactions, and are jointly and severally liable therefor.

61.    As a result, Plaintiffs are entitled to damages, and to declaratory and injunctive relief (i) restoring the Plaintiffs to the position they would have been in but for Defendants' unlawful conduct, which includes compelling the City to permit Plaintiffs to connect to the City's

stormwater sewer, (ii) paying damages for the financial loss caused by the City Defendants' actions and inactions, (iii) enjoining the City from further interference with Plaintiffs' projects, and (iv) paying Plaintiffs' legal fees under 42 U.S.C. §1988.

## COUNT III
## ARTICLE I., §11 OF THE CONNECTICUT CONSTITUTION – UNLAWFUL TAKING
### (against the City and the City Does)

62.     Plaintiffs repeat and re-allege the allegations contained in each of the preceding paragraphs as if fully set forth herein.

63.     Defendants' actions complained of herein also constitute an unlawful taking of Plaintiffs' property under Article I., §11 of the Connecticut Constitution.

64.     As a result, Plaintiffs are entitled to damages, and to declaratory and injunctive relief (i) restoring the Plaintiffs to the position they would have been in but for Defendants' unlawful conduct, which includes compelling the City to permit Plaintiffs to connect to the City's stormwater sewer, (ii) paying damages for the financial loss caused by the City Defendants' actions and inactions, (iii) enjoining the City from further interference with Plaintiffs' projects, and (iv) paying Plaintiffs' legal fees under 42 U.S.C. §1988.

## COUNT IV
## TORTIOUS INTERFERENCE WITH PLAINTIFFS' BUSINESS EXPECTANCIES
### (against the City and the City Does)

65.     Plaintiffs repeat and re-allege the allegations contained in each of the preceding paragraphs as if fully set forth herein.

66.     "It is well established that the elements of a claim for tortious interference with business expectancies are: (1) a business relationship between the plaintiff and another party; (2) the defendant's intentional interference with the business relationship while knowing of the relationship; and (3) as a result of the interference, the plaintiff suffers actual loss." *Hi-Ho Tower,*

*Inc. v. Com-Tronics, Inc.*, 255 Conn. 20, 27, 761 A.2d 1268 (2000).

67.     Plaintiffs have an existing business relationship with UI.  Plaintiffs have contracted with UI to sell to UI the renewable energy credits generated from the Benz Solar Projects.  The City is and at all relevant times was aware of this relationship because the scope of the relationship was described in detail in the petition filed in the proceedings before the CSC, proceedings in which the City actively participated.

68.     Plaintiffs have suffered an ascertainable loss of money because the Plaintiffs have lost, and will continue to lose, revenue from its facilities that it would have received but for the City Defendants' unlawful actions.

69.     In addition, Plaintiffs have suffered an ascertainable loss of money because the Plaintiffs have incurred costs that would not have been incurred were it not for City Defendants' unlawful actions, such as litigation costs to bring this action.  The City Defendants have interfered with and continue to interfere with Plaintiffs' business relationship and expectancies with UI and Plaintiffs seek compensatory, incidental, expectation, and consequential damages, attorneys' fees and punitive damages.

**COUNT V**
**EQUAL PROTECTION**
**(Violation of the Fifth and Fourteenth Amendments to the U.S. Constitution**
**and 42 U.S.C. § 1983)**
**(against the City and the City Does)**

70.     Plaintiffs restate and incorporate by reference each and every allegation in each of the preceding paragraphs as if fully set forth herein.

71.     The City Defendants' actions complained of herein also constitute a violation of Plaintiffs' rights to equal protection under the Fifth and Fourteenth Amendments to the U.S. Constitution.

72.    The City Defendants have treated, and treat, Plaintiffs differently as compared to similarly situated landowners and project developers.

73.    By acting under the color of state law to deprive Plaintiffs of rights guaranteed by the Constitution and laws of the United States, the City Defendants have violated and continue to violate 42 U.S.C. §1983.

74.    All City Defendants conspired to deprive, and participated in the deprivation of, Plaintiffs' rights through their affirmative actions, and are jointly and severally liable therefor.

75.    As a result, Plaintiffs are entitled to damages, and to declaratory and injunctive relief (i) restoring the Plaintiffs to the position they would have been in but for the City Defendants' unlawful conduct, which includes compelling the City to permit Plaintiffs to connect to the City's stormwater sewer, (ii) paying damages for the financial loss caused by the City Defendants' actions and inactions, (iii) enjoining the City from further interference with Plaintiffs' projects, and (iv) paying Plaintiffs' legal fees under 42 U.S.C. §1988.

## COUNT VI
## BREACH OF CONTRACT
### (against the UI Defendants)

76.    Plaintiffs restate and incorporate by reference each and every allegation in each of the preceding paragraphs as if fully set forth herein.

77.    The UI Defendants have breached of their obligation to timely provide Plaintiffs with interconnection agreements, which hinders and prevents the Plaintiffs from constructing the solar farms, which unlawful hindrance is a breach of the REC Contracts (including the Ansonia Contracts and the Woodbridge Contract among others).

78.    The UI Defendants have also hindered and prevented Plaintiffs' performance under the REC Contracts (including the Ansonia Contracts and the Woodbridge Contract among

others) because of UI's unreasonable and unjust practices and costs in the interconnection process for each of the projects that would deliver RECs under the Contracts. The UI Defendants have failed to timely and properly proceed on a just and reasonable basis with the interconnection process for Plaintiffs' projects to connect to the electric grid, which constitutes a breach of the Contracts and a breach of the covenant of good faith.

79.    Plaintiffs seek a declaration that the UI Defendants have breached the Contracts and their obligations to provide a just and reasonable and timely interconnection for Plaintiffs' projects.  Plaintiffs seek damages in an amount equal to (i) 100% of the performance assurance deposits under the Contracts plus (ii) the sum of all amounts that Plaintiffs would have been received over the 15-year term of the Contracts assuming the projects were built and delivered RECs for the full 15-year term plus (iii) other damages to be proved at trial, attorneys' fees and punitive damages.

### COUNT VII
### DECLARATION OF FORCE MAJEURE
### (against the UI Defendants)

80.    Plaintiffs restate and incorporate by reference each and every allegation in each of the preceding paragraphs as if fully set forth herein.

81.    Article 15.1 of the Contracts provide:

Force Majeure. (a) Except as otherwise set forth in this Agreement, neither Party shall be liable to the other Party for failure or delay in the performance of any obligation under this Agreement during the Term if and to the extent that such delay or failure is due to a Force Majeure Event.

82.    Article 1.23 of the Contracts provides:

"Force Majeure Event" means any cause beyond the reasonable control of, and not due to the fault or negligence of, the affected Party and which could not have been avoided by the affected Party's reasonable due diligence, or was not caused by the affected Party, including, as applicable, war,

terrorism, riots, embargo or national emergency; curtailment of electric distribution services; fire, flood, windstorm, earthquake, or other acts of God; strikes, lockouts, or other labor disturbances (whether among employees of Seller, its suppliers, contractors, or others); delays, failure, and/or refusal of suppliers to supply materials or services; orders, acts or omissions of the NEPOOL GIS Administrator, as applicable; or any other cause of like or different kind, beyond the reasonable control of Seller. Notwithstanding the foregoing, a Force Majeure Event shall not be based on Seller's ability to sell LRECs or ZRECs at a price greater than the Purchase Price, Buyer's ability to purchase LRECs or ZRECs at a price below the Purchase Price, or Purchaser's inability to resell the LRECs or ZRECs.

83.     Plaintiffs ask for a declaratory judgment that each of the following circumstances all of which are beyond the reasonable control of Plaintiffs, constituted and still constitute a valid Force Majeure Event:

a.  The UI Defendants' failure to timely and properly proceed on a just and reasonable basis with the interconnection process for Plaintiffs' projects to connect to the electric grid;

b.  The UI Defendants' breach of the Contracts;

c.  The UI Defendants' failure to adhere to the filed interconnection tariff;

d.  Plaintiffs' inability to finalize a financing commitment for the projects;

e.  In the case of the Ansonia Contracts, the City's refusal to permit the Plaintiffs to connect to the City's stormwater sewer,

all of which are beyond the reasonable control of Plaintiffs.

84.     Plaintiffs ask for a declaratory judgment that a valid claim of a Force Majeure Event existed and still exists under the Contracts (including the Ansonia Contracts and the Woodbridge Contract among others), and that Plaintiffs obligations under the Contracts were suspended by the Force Majeure Event.

## COUNT VIII
## DAMAGES FOR FAILURE TO RETURN PERFORMANCE ASSURANCE DEPOSIT
### (against the UI Defendants)

85.     Plaintiffs restate and incorporate by reference each and every allegation in each of the preceding paragraphs as if fully set forth herein.

86.     Article 9.2 of the Contracts requires UI to return the performance assurance deposit if a Contract is terminated "because the Facility was not constructed due to a Force Majeure Event," or "due to an Event of Default by Buyer."

87.     The Ansonia projects have not been constructed, and will not be able to be constructed, due to a Force Majeure Event," or "due to an Event of Default by Buyer." As a result, the UI Defendants must return the performance security deposits for the Ansonia projects' Contracts.

88.     UI has failed to return the performance assurance.

89.     In the alternative to the other remedies requested herein, Plaintiffs seek judgment for damages in an amount equal to 100% of the performance assurance for the Ansonia projects' Contracts.

## COUNT XIX
## DECLARATION THAT TERMINATION NOTICES WOULD BE INVALID UNDER
## THE PREVENTION DOCTRINE
### (against the UI Defendants)

90.     Plaintiffs restate and incorporate by reference each and every allegation in each of the preceding paragraphs as if fully set forth herein.

91.     The prevention doctrine prohibits UI from terminating the Contracts.

92.     UI has prevented, hindered and/or rendered impossible the occurrence of a condition precedent to its obligation to perform, or to the performance of a return promise, and

therefore is not relieved of the obligation to perform, and may not legally terminate the contract for nonperformance.

93.     The UI Defendants' breach of their obligation to timely and properly proceed on a just and reasonable basis with the interconnection process for Plaintiffs' projects to connect to the electric grid, have prevented, hindered, and/or rendered impossible the occurrence of the condition that Plaintiffs begin delivering RECs by a certain date.

94.     Although motive is not necessary for the application of the prevention doctrine, the UI Defendants had motive to hinder Plaintiffs' projects.   Solar projects like the Plaintiffs' pose a competitive threat to the renewable energy projects that the UI Defendants own—such as their offshore wind projects.  In addition, some of the Plaintiffs and their owner have sued to stop the UI Defendants' offshore wind projects.  The more solar projects that are built, the lower the need for alternative renewable energy sources such as offshore wind.

95.     The UI Defendants' hindrance was improper in both motive and means.

96.     Any interests that the UI Defendants purport to advance through their hindrance are pretextual.

97.     Plaintiffs seek a declaration that any termination notices that the UI Defendants would send to Plaintiffs would be invalid, and that the Delivery Term Start Date in each Contract would be the actual date each project goes into service under its respective Contract.

98.     In the alternative Plaintiffs seek a declaration that the UI Defendants have breached the Contracts and its obligations to provide a just and reasonable and timely interconnection for Plaintiffs' projects.  Plaintiffs seek damages in an amount equal to (i) 100% of the performance assurance deposits under the Contracts plus (ii) the sum of all amounts that Plaintiffs would have been received over the 15-year term of the Contracts assuming the projects

were built and delivered RECs for the full 15-year term plus (iii) other damages to be proved at trial, attorneys' fees and punitive damages.

### COUNT X
### EQUITABLE ESTOPPEL
### (against the UI Defendants)

99.    Plaintiffs restate and incorporate by reference each and every allegation in each of the preceding paragraphs as if fully set forth herein.

100.    "Equitable estoppel" requires proof of two essential elements: first, the party against whom estoppel is claimed must do or say something calculated or intended to induce another party to believe that certain facts exist and to act on that belief; and second, the other party must change its position in reliance on those facts, thereby incurring some injury.

101.    UI is also obligated to timely and properly proceed on a just and reasonable basis with the interconnection process for Plaintiffs' projects to connect to the electric grid.  UI failed to observe those obligations.

102.    Plaintiffs justifiably relied on UI's obligations in executing the Contracts and expending funds in preparation for performance under the Contracts, and their partial performance under the Contracts.

103.    Plaintiffs seek a declaration that UI is estopped from terminating the Contracts.

104.    Plaintiffs also seek a declaration that the Delivery Term Start Date on each Contract would be the actual date each project goes into service under its respective contract.

### COUNT XI
### DAMAGES FOR WITHHELD DEPOSITS—DISPROPORTIONATE FORFEITURE
### (against the UI Defendants)

105.    Plaintiffs restate and incorporate by reference each and every allegation in each of the preceding paragraphs as if fully set forth herein.

106.    As an alternative to Plaintiffs' other claims herein for the return of performance assurance deposits, the performance assurance deposits must be returned to Plaintiffs to avoid a disproportionate forfeiture.

107.    The occurrence of a condition may, in appropriate circumstances, be excused in order to avoid a disproportionate forfeiture.

108.    Here the result would be all one-sided.  Plaintiffs would lose substantial amounts of deposits and also lose the value of investments they made in each of the Projects.

109.    On the other hand, UI would lose nothing by excusing the condition.  UI will not be able re-allocate any of the REC purchase quantity to other projects.

110.    In the circumstances of this case, it would be unfair and inequitable for UI to retain the deposits, and cause the loss of value the Plaintiffs made in each of the Projects in reliance and in anticipation of performance.

111.    Plaintiffs seek a declaration that any UI termination notices would be invalid, and damages in an amount equal to 100% of the performance assurance deposit plus other damages to be proved at trial.

### COUNT XII
### VIOLATION OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT
### (against the UI Defendants)

112.    Plaintiffs restate and incorporate by reference each and every allegation in each of the preceding paragraphs as if fully set forth herein.

113.    The Connecticut Unfair Trade Practices Act ("CUTPA") provides, in Conn. Gen. Stat. §42-110b(a), that: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

114.    UI is not only a counterparty under the REC Contracts, the UI Defendants are a competitor of Plaintiffs.

115.    Solar projects like the Plaintiffs' pose a competitive threat to the renewable energy projects that the UI Defendants own—such as the its offshore wind projects. The more solar projects that are built, the lower the need for alternative renewable energy sources such as offshore wind. In addition, some of the Plaintiffs and their owner have sued to stop the UI Defendants' offshore wind projects.

116.    The UI Defendants' hindrance was improper in both motive and means.

117.    Any interests that the UI Defendants purports to advance through their hindrance are pretextual.

118.    The unfair methods of competition used against Plaintiffs are the UI Defendants' using unjust and unreasonable practices in the interconnection process for Plaintiff's projects.

119.    Plaintiffs seek a declaration that the UI Defendants have violated the CUTPA, and damages in an amount equal to (i) 100% of the performance assurance deposits under the Contracts plus (ii) the sum of all amounts that Plaintiffs would have been received over the 15-year term of the Contracts assuming the projects were built and delivered RECs for the full 15-year term plus (iii) other damages to be proved at trial, attorneys' fees and punitive damages.

## COUNT XIII
## PLAINTIFFS' PERFORMANCE WAS EXCUSED
### (against the UI Defendants)

120.    Plaintiffs restate and incorporate by reference each and every allegation in each of the preceding paragraphs as if fully set forth herein.

121.    Under Conn. Gen. Stat. §42a-2-615 "[d]elay in delivery or nondelivery in whole or in part by a seller is not a breach of his duty under a contract for sale if performance as agreed has

been made impracticable by the occurrence of a contingency the nonoccurrence of which was a basic assumption on which the contract was made."

122.    A basic assumption of Plaintiffs on which the Contracts were made, was that the UI Defendants would adhere to their obligations to timely and properly proceed on a just and reasonable basis with the interconnection process for Plaintiffs' projects to connect to the electric grid.  UI failed to observe those obligations

123.    Plaintiffs' performance in the Contracts has been made impracticable by the occurrence of a contingency—the failure of the UI Defendants to honor those obligations.

124.    As a result, UI has no lawful basis to retain the performance assurance deposits of the Ansonia Contracts.

125.    Plaintiffs seek a declaration that Plaintiffs' obligations were excused, and alternatively damages in an amount equal to 100% of the performance assurance for the Ansonia Contracts UI plus other damages to be proved at trial.

## PRAYER FOR RELIEF

1.    For the reasons stated, Plaintiffs respectfully requests the following relief:

    a.    Grant judgment in favor of Plaintiffs and against Defendants;

    b.    Issue the declarations requested herein by Plaintiffs;

    c.    Grant all appropriate requested injunctive relief;

    d.    Award Plaintiffs' damages and punitive damages;

    e.    Award Plaintiffs their reasonable attorney fees pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988; and

    f.    Grant Plaintiffs such other relief as is just and appropriate.

Dated: June 26, 2023

THE PLAINTIFF,

*/s/ Thomas Melone*
Thomas Melone
Allco Renewable Energy Limited
157 Church St., 19th Floor
New Haven, CT 06510
(212) 681-1120
Thomas.Melone@AllcoUS.com
Juris No. 438879

*Attorney for Plaintiffs*